CHARLES WARNER CO. v. UNITED STATES.

(Circuit Court, D. Delaware. February 20, 1900.)

No. 5.

1. ACTION AGAINST UNITED STATES—ANSWER.

In a suit against the United States under the act of March 3, 1887 (24 Stat. 505), a failure to file answer and notice within the period prescribed by section 6 of that act is not a jurisdictional defect, but only an irregularity which may be waived.

2. CONTRACTS—CONSTRUCTION.

Where the United States charters a steam-tug for attendance on other vessels, not possessing the power of self-propulsion, engaged in government work at Cross Ledge Light in Delaware Bay, in order to remove them to a place of safety in case of stress of weather or accident, not furnishing the crew or pilot of such steam-tug, competent knowledge is required on the part of those having the tug in charge of the waters of that portion of the bay including the depth of water and channels between Cross Ledge Light and Morris River which is the most convenient and accessible haven of refuge, and the United States in engaging the services of the steam-tug had a right to assume that her master or pilot possessed such knowledge or at least that she was provided with a suitable chart of the bay from which such knowledge might be derived.

3. SAME—SUFFICIENCY OF APPLIANCES.

The owner of a barge, not self-propelling, in contracting with the United States for the chartering or hiring of such barge by the latter, undertook that she should be "in first-class condition, fully equipped, with all the necessary anchors, lines, chains, pumps, etc.," and that she should be "in charge of a competent man to be selected and paid" by the owner; the contract also providing for an inspection of the vessel by the United States before it should enter the service of the latter. Held, on the facts, that the

provision for inspection was a stipulation on the part of the United States reserving to it the right to decline to permit the vessel to enter its service should the United States be dissatisfied with her condition, and was not intended to nor did it directly or indirectly operate to relieve the owner of his obligation that the vessel should be in proper condition, with sufficient equipment and in charge of a competent man.

(Syllabus by the Court.)

Benjamin Nields and John P. Nields, for petitioner.
Lewis C. Vandegrift, U. S. Dist. Atty.

BRADFORD, District Judge. This suit is a proceeding by the Charles Warner Company, a corporation of Delaware, against the United States by petition under the provisions of the act of Congress of March 3, 1887 (24 Stat. 505), entitled "An act to provide for the bringing of suits against the Government of the United States." The amount demanded by the petitioner as set forth in the petition is $2,092.72, with interest, that sum representing, as alleged, the balance of certain indebtedness of the United States to the petitioner for the price of cement and hawsers, the cost of repairing damage sustained by the barge Saunterer and certain incidental expenses connected therewith, the value of a small boat which was destroyed, and the hire and services of certain vessels. The facts in the case found by the court are as follows. In the summer of 1893 the United States undertook to repair Cross Ledge Light Station in the Delaware Bay, and for the purpose of carrying on the work certain negotiations were entered into between duly authorized agents of the United States and the petitioner. The petitioner wrote June 17, 1893, to Capt. F. A. Mahan of the U. S. Engineer Corps, then stationed in Philadelphia, in part as follows:

"We are in receipt of yours of the 16th inst., asking for a boat 100 feet in length, 25 feet beam, with capacity of 175 to 225 tons. In about ten days from this date we might spare you our barge Saunterer. This is a house barge, 100 feet long, 23 feet, six inches beam and eight feet hold. She is covered and competent to carry 150 tons on deck. * * * Our price would be $10 per day, with vessel at Government's risk."

The petitioner again wrote June 20, 1893, to Capt. Mahan in part as follows:

"We will charter you one of our small sand scows at ten dollars per day; and the barge Saunterer at ten dollars per day, Sundays included, you to assume all risk of vessels. We will charge you for towage forty dollars each round trip of tug, Wilmington or Bulk Head Bar, to Cross Ledge Light and return. Please advise about the time you will want these barges. We will deliver 350 to 1,000 barrels of Alsen's cement on lighter at Wilmington at $2.75 per bbl."

H. F. Brandebury, superintendent of construction, by direction of Capt. Mahan wrote July 1, 1893, to the petitioner in part as follows:

"Your proposition of June 20, 1893, in relation to the hire of certain vessels, etc., is accepted under the following conditions: The barge 'Saunterer' and small scow will be chartered by this office on and after July 12, 1893, for the sum of ten (10) dollars per day each, (Sundays included), it being understood that both vessels shall be in first-class condition, fully equipped, with all the necessary anchors, lines, chains, pumps, etc., and that each shall be in charge of a competent man to be selected and paid by you. An inspection of the vessels will be made on or before July 8, and, if found in proper condition, the same will enter the service of the United States on July 12, 1893, and continue

therein until otherwise directed. The United States will be responsible for and assume all risks on account of loss or damage to the vessels by reason of storms, fire or accident while at Cross Ledge Light. The United States will not be responsible for nor pay any charges on account of loss or damage to said vessels from any cause while en route from Wilmington to Cross Ledge Light or returning therefrom. In this connection it is well to add that it is the intention of this office to employ one of your tugs to do the necessary towing. The men you place in charge will have undisputed authority over and direction of the boats, the loading and unloading of the same. It is expected that they will faithfully perform the duties assigned them and give all the necessary assistance by direction and otherwise, so far as the handling of the boats are concerned, when called on so to do. Your bid for towage 'forty (40) dollars for each round trip' is accepted. It is not known at present just how much towing will be necessary. Your bid to furnish Alsen's Portland cement f. o. b. the boats at Wilmington @ $2.75 per barrel, is also accepted. You will please have at the disposal of the agent of this office 350 barrels of the same. In each and every instance the cement called for will be placed on the lighter in prime condition and in tight barrels. The full quantity required cannot at this writing be stated. Perhaps 350 barrels will be sufficient. * * * I shall call and perfect arrangements on Wednesday, July 5th, about say 10 a. m."

Brandebury visited the petitioner in Wilmington July 2 or 3, 1893, and inspected the barge Saunterer and her equipment. The inspection was not a minute, particular and thorough examination in detail, but an examination somewhat general in its character for the purpose of ascertaining what the vessel was like and whether it and its equipment were suitable for the work for which it was to be employed at Cross Ledge Light. The result of the inspection was, save as to some minor details unnecessary to be recapitulated, satisfactory to Brandebury. On the same day he examined a scow similar to but smaller than scow No. 2 which afterwards was towed to Cross Ledge Light as hereinafter mentioned. No insufficiency in scow No. 2 is either alleged or appears from the evidence. Brandebury again visited the petitioner in Wilmington on the morning of July 5 and at that time a certain correction or modification of the offer contained in the letter of July 1 to hire the Saunterer and scow were agreed on by Brandebury and the petitioner. This correction consisted of the insertion of the words "of steam-tug" after the words "each round trip," making the sentence containing the correction read as follows: "Your bid for towage forty (40) dollars for each round trip of steam-tug is accepted." In reply to Brandebury's letter of July 1, as corrected on July 5, the petitioner wrote on the day last mentioned to Brandebury in part as follows:

"Replying to your favor of July 1, confirming our conversation of this morning, we beg to say that as corrected the conditions as stated therein are satisfactory to us, and we will have the barge ready for you on July 12 with 350 barrels Alsen's on barge, unless we are advised differently by you prior to that date. * * * It is understood the value of each barge, in case of loss or damage, is $3,000, and that the towage of $40 is for the round trip of steam tug, whether towing or light."

The principal contract between the parties, so far as material to this case, as it existed prior to July 15, and in so far as it was evidenced by writing, is contained in the correspondence above quoted. The Saunterer is a freight barge without propelling power of her own either by steam or sail. She is provided with a mast and gaffs for hoisting and has a freight house on her main deck. She is 98

feet long and her breadth of beam is 23 feet and 6 inches. Her depth of hold is 7 feet and the distance between the main deck and the upper deck or top of the freight house is also 7 feet. She was built about 1870 for carrying freight between Wilmington and New York and was used for freighting purposes between those cities and also between Wilmington and Philadelphia. While owned by the petitioner the Saunterer was several years prior to July, 1893, employed on work for the United States at Ship John Light in Delaware Bay and while so engaged had by reason of the condition of wind and water narrowly escaped being lost, being unaccompanied by any vessel capable of rendering her assistance. There is a conflict of testimony between the president of the petitioner and Brandebury as to certain alleged oral statements by the former at the time of the inspection by the latter of the Saunterer as to her seaworthiness and whether she would be safe at Cross Ledge Light without a tug-boat to move her. This contradictory evidence, however, is not of such a character as to add to or detract from the effect of the contract as disclosed in the written correspondence, and it is therefore unnecessary particularly to allude to it. Pursuant to the contract between the parties the petitioner between July 5 and 13 furnished and delivered on board the Saunterer at Wilmington 350 barrels of Alsen's Portland cement in prime condition and in tight barrels, the agreed price for the cement being $2.75 per barrel, aggregating for the whole quantity furnished $962.50. Subsequently 48 barrels of this cement were returned from Cross Ledge Light and of all so returned the petitioner had the use and benefit. The amount claimed on account of cement so furnished is $830.50 with interest, representing 302 barrels at $2.75 per barrel. Between July 5 and 13 scow No. 2 which had been approved by Brandebury was laden at Wilmington with certain material for the use of the United States at Cross Ledge Light. The Saunterer and scow having been chartered or hired by the petitioner to the United States under and pursuant to the contract above mentioned for the sum or price of $10 per day each, the petitioner placed Addison Rash in charge of the Saunterer and John Dilks in charge of the scow, and the Saunterer and scow in charge of Rash and Dilks respectively started July 13 about noon with their cargoes and equipment for Cross Ledge Light in tow of the steamtug Meteor furnished by the petitioner. The vessels arrived at their destination early in the evening of the same day, when the Saunterer and scow were anchored at a short distance from Cross Ledge Light and on the easterly side thereof; the Meteor a few hours later leaving the Saunterer and scow where they had been anchored and returning the same evening to Wilmington. There was a thundergust of short duration and not of a violent character from the northwest at Cross Ledge Light late on the evening of July 13 while these vessels lay at anchor, which, however, did not result in any appreciable damage to either of them or to their contents. The gust was succeeded by fine weather and certainly until toward or about noon on Saturday, July 15, there was nothing in the condition of the wind or water calculated to cause damage to either of the vessels if in proper condition or to their contents. During the morning and aft-

ernoon of that day the general direction of the wind was fro.n the southeast, blowing up the bay. The tide turned to ebb between ten and eleven o'clock in the morning and thereafter the wind meeting the tide caused the water to be rougher than it would have been had the tide not changed. From the time the tide turned to ebb until the Saunterer was taken away as hereinafter stated that vessel remained at anchor, being anchored from her bow, and the relation of the tide to the wind was such that she continued in the trough of the sea rolling considerably from side to side. The evidence as to the condition of the wind and water while the Saunterer remained in this position is voluminous and conflicting. But the following facts in this connection are established by a decided preponderance of the evidence. There was no storm during that time and at that place in any legitimate sense of the term. None of the weather records at the light-houses in the vicinity, of which copies are in evidence, show the existence of a storm. Indeed, the references made therein to the state of the weather are such as clearly to indicate to the contrary. The day was bright and sunshiny. The velocity of the wind was not more than ten or fifteen miles an hour. There was only what is known as a whole-sail breeze. The height of the waves where the Saunterer lay did not exceed three feet from trough to crest. The ground tackle of the Saunterer and scow held them without any dragging. A boat of the size of a small gunning skiff was rowed, while the water was as rough as it had been that day, in safety and without difficulty from Cross Ledge Light to the vessels, and carried a line from the scow to the Saunterer, and a line from the latter vessel to the steam-tug Taurus just before the tug took her and the scow away from that place on the same day as hereinafter mentioned. Other row boats of substantially the same size were also used on the water without difficulty or danger on the same afternoon in the vicinity of Cross Ledge Light. Brandebury went to Cross Ledge Light with the Saunterer and scow July 13 and from that place wrote to the petitioner on the evening of that day or on the next following day, stating that it was necessary to have a tug there and asking on what terms the petitioner would charter the Taurus. He had concluded that the service of a tug would facilitate the handling of the Saunterer and scow and also conduce to their safety. The petitioner telegraphed to Capt. Mahan on the morning of July 15 as follows:

"Mr. Brandebury has written it will be necessary to have tug constantly at ledge and requests us to telegraph rate we will charter the 'Taurus.' We will name $40 per day, tug at Government risk."

In answer to the above telegram Capt. Mahan on the same morning telegraphed to the petitioner as follows:

"Your offer of Tug Taurus for forty dollars per day for Cross Ledge is accepted."

Pursuant to the agreement thus entered into the petitioner sent the Taurus to Cross Ledge Light July 15, where she arrived between three and four o'clock in the afternoon. During that day until after the arrival of the Taurus all the cement with which the Saunterer was

laden in Wilmington remained on her, from two-thirds to three-fourths of it being in tight barrels in the hold, and the residue in similar barrels together with a quantity of sand being in the freight house on her main deck.    The evidence does not satisfactorily show that before the arrival of the Taurus, while the Saunterer lay broadside to the sea as above described, any of the cement was damaged or destroyed by water shipped by reason of her rolling or that by reason of such rolling she shipped water in such manner or quantity as to be calculated to produce material damage to her cargo.    The evidence on the contrary points to a different conclusion.    It appears, however, that the Saunterer herself while so rolling sustained injury.    The nature and cause of such injury are shown, but not its extent.    Encircling the upper portion of the Saunterer's mast was an iron collar or band to which her shrouds were attached.    So long as the band remained in its proper place on the mast and the shrouds continued taut the vessel received no damage.    But as she rocked to and fro the weight of the mast and of the gaffs or hoisting spars with which it was provided caused the tension of the shrouds on the band to be largely increased alternately on the one side and the other, and under the stress of this alternating tension of the shrouds the band "chewed the mast" in such manner as to slip down a distance of about a foot, thereby slackening the shrouds to such an extent that they no longer held the mast in proper position, but allowed it to work from side to side in the vessel.    This lateral play of the mast, together with the sudden tightening of the shrouds first on one side and then on the other by reason of the rocking or rolling of the vessel, caused her seams to open, though to what extent or in what portion of her hull the evidence does not disclose.    Had the mast been provided with a shoulder or other proper support for the collar or band, whatever injury the Saunterer received before the arrival of the Taurus would have been avoided.    The petitioner knew where the Saunterer was to serve while the work at Cross Ledge Light was progressing and had no reason to believe that after she left Wilmington July 13 and before the Taurus arrived at Cross Ledge Light two days thereafter the former vessel was or was to be attended by a steam-tug or other self-propelling vessel for her protection.    The petitioner also knew that the Saunterer had theretofore been employed in Delaware Bay and there been in grave peril of loss, and was chargeable with knowledge that a vessel of her size and construction at anchor in the lower bay would, when lying broadside to the sea, even in the absence of a storm, rock or roll in such manner as to subject the mast-band or collar to a severe strain, and that such a condition of things was likely to occur. In omitting to provide a shoulder or other proper support for the band the petitioner failed to observe the degree of care or precaution which might reasonably have been expected, and in the absence of such provision the Saunterer was not then or at the time she left Wilmington for Cross Ledge Light in first-class or proper condition for the service for which she was chartered or hired.    But further, the Saunterer should not have been so handled as to permit her on or after the change of the tide from flood to ebb to swing into the trough of the sea and there continue rocking and rolling.    Had that vessel been in charge of

a competent person and provided with ground tackle suitable in kind and quantity and with proper appliances for the convenience and safety of herself and her cargo in the lower bay, particularly when unattended by a tug or other self-propelling craft, no reason is perceived why she should have been allowed to swing broadside to the sea and remain in that position. For several hours before the tide changed the wind was from the southeast and the tide was running in practically the same direction, and during all this time the Saunterer, anchored only from the bow, must have had her head to the sea. A fresh southeast breeze with an ebb tide obviously would tend to cause a vessel so anchored to roll more or less in the trough of the sea, and possibly to ship water and strain herself. If before or at the change of the tide the Saunterer had been anchored from the stern as well as from the bow she would have remained head to the sea and have largely or wholly escaped the rocking and rolling to which she was subjected. It seems, however, that she was not provided with ground tackle and appliances suitable for that purpose, and it does not appear that Rash, who was in charge of her, at any time either attempted or suggested that an attempt be made so to dispose of the vessel. That she should have been allowed to swing broadside to the sea was the result either of incompetence on the part of Rash or of an insufficient equipment or supply of ground tackle and appliances, or, possibly, of both. The wind having sensibly increased about or shortly after noon on July 15, and Brandebury, who was then at Cross Ledge Light, fearing that the ground tackle of the scow might fail to keep her from going on the rocks at that place and also being apprehensive for the safety of the Saunterer as well as of the scow should the wind continue to grow stronger, he deemed it prudent that both vessels should be removed temporarily to a place of safety. Having reached this conclusion about or shortly before three o'clock in the afternoon, he examined an official chart of the bay and shortly before the arrival of the Taurus laid down on the chart a course from Cross Ledge Light to Maurice River on the easterly side of the bay as one over which the vessels safely might be towed. When the Taurus arrived he sent a man who was familiar with the waters of the bay between Cross Ledge Light and Maurice River and had been present when Brandebury laid down the course on the chart, in a small row boat to the tug with an oral order that the tug should forthwith proceed with the Saunterer and scow to Maurice River and with instructions to the messenger to act as pilot should those on the tug not be familiar with those waters. The master and the pilot of the Taurus, after consultation with each other, declined to obey Brandebury's order to proceed to Maurice River on the ground, as alleged, that in their judgment it would be unsafe so to do; and the tug against the order and will of Brandebury started down the bay with the Saunterer and scow in tow about four o'clock the same afternoon, and having reached the lower end of Cross Ledge proceeded westerly into the main channel and thereafter followed that channel up the bay until it with its tow left the channel to go into Duck Creek on the westerly side of the bay, where it arrived late in the evening of the same day. The evidence shows that the Saunterer in passing, in the trough of the sea, around the lower end of Cross Ledge and into the

main channel, and while continuing therein on her way up the bay, was seriously strained and racked. During this time she rapidly made water, her pumps were unable to keep it down, a large portion of the cement in the hold was injured or destroyed, and a number of barrels of cement were by direction of the superintendent of the petitioner thrown overboard. After reaching Duck Creek she was run aground, and she and the scow were shortly thereafter on the same night left there by the Taurus which proceeded to Wilmington. The Saunterer and scow when left by the tug in Duck Creek were unnecessarily at such distance from each other that it was impracticable to transship from the former to the latter such of the cement in the freight house as had not been injured, and with the rise of the tide early on the following morning all of the cement which had not theretofore been injured, with the exception of 48 barrels of which the petitioner had the use and benefit as above stated, was destroyed. It appears from the evidence that neither the master nor pilot of the Taurus was familiar with the waters of the bay between Cross Ledge Light and Maurice River and that the tug was not provided with a chart of the bay. A decided preponderance of evidence is to the effect that under the then existing conditions of wind and tide there was sufficient depth of water to allow the Taurus with the Saunterer and scow in tow to proceed from Cross Ledge Light to Maurice River in obedience to Brandebury's order; that such a course was shorter than that to Duck Creek; that the course laid down on the chart by Brandebury was a practicable one; that less rough water would have been encountered; that it was much safer than that taken by the Taurus; and that it is highly probable that had the vessels been towed to Maurice River much less damage would have been received by the Saunterer and her cargo than resulted from her trip to Duck Creek. One of the obvious purposes for which it was desirable to have the Taurus in attendance on the other vessels was to remove them to a place of safety in case of stress of weather or accident. This required competent knowledge on the part of those having the tug in charge of the waters of that portion of the bay including the depth of water and channels between Cross Ledge Light and Maurice River, which was the most convenient and accessible haven of refuge. The United States in engaging the services of the Taurus had a right to assume that her master or pilot possessed such knowledge or at least that she would be provided with a suitable chart of the bay from which such knowledge might be derived. While most, if not all, of the damage to the cement occurred after the Saunterer had been taken in tow by the Taurus, the evidence does not show what proportion of the damage to the former vessel was received before that time. It appears, however, that most of the straining and racking to which she was subjected occurred after the Taurus in disregard of Brandebury's order began to tow her into the main channel. The other facts of the case may briefly be disposed of. On July 16, the day following that on which the Taurus left the Saunterer and scow in Duck Creek as above stated, the Meteor was sent by the petitioner to Cross Ledge Light. She returned to Wilmington the same day. The petitioner seeks to recover $40 for this round trip. The Meteor rendered no service to the United States on that day and the

evidence does not disclose any request by the United States that she should make the trip, or any undertaking on the part of the United States to pay the petitioner therefor. The Meteor again went to Duck Creek July 17 and pumped water out of the Saunterer and towed her to Wilmington on the same day. The petitioner claims $20 for such pumping and $40 for the round trip of the Meteor. There was no undertaking by the United States to pay either for the pumping or for such round trip. Neither inured to the benefit of the United States, but both were solely for the protection of the property of the petitioner. On July 18 the petitioner caused the tug Martha to tow the Saunterer from the southerly side of the Christiana River to the yard of the Jackson & Sharp Company for repairs, and for such towage seeks to recover $3. There is no evidence of any undertaking by the United States to pay for such towage. The Saunterer received certain repairs at the yard of the Jackson & Sharp Company for which the petitioner paid $707.42. This amount the petitioner claims from the United States. Unless the United States was liable for the damage sustained by the Saunterer there was no contract express or implied on the part of the United States to pay the whole or any part of this sum. The petitioner claims to be entitled to hire for the Saunterer at $10 per day for 18 days from July 12 to July 29, 1893, inclusive, covering the period during which she was repaired. The evidence shows that she was in fact in the service of the United States only on July 12, 13, 14 and 15, and there is nothing to show any undertaking or liability by or on the part of the United States for her hire beyond the sum of $40 for those four days. The petitioner seeks to recover $40 for the trip of the Taurus to Cross Ledge Light July 15 and her return to Wilmington on the evening of that day. She was chartered or hired to render service to the United States, but wholly failed to do so. On the contrary, against the order and will of Brandebury, the master and pilot of the tug refused to go to Maurice River and through their incompetence or willfulness pursued a different and dangerous course to the great damage of the Saunterer and her cargo as heretofore stated. The petitioner claims the right to recover $14.40 for unloading sand and damaged cement from the Saunterer after she had been towed to Wilmington by the Meteor as above stated. This work did not inure to the benefit of the United States and there was no contract, express or implied, between the United States and the petitioner that the latter was to be paid for it. The petitioner also claims to be entitled to $10 as an unpaid balance of the hire for the scow at $10 per day. But it appears from the petition that the scow was in the employ of the United States only from July 11 to August 6, 1893, inclusive, a period of 27 days, and it is admitted in the petition that the petitioner has received from the United States $270 for such hire. The petitioner originally claimed that it was entitled to recover from the United States $81.40, for two hawsers sent by it to Cross Ledge Light, valued respectively at $75 and $6.40. These hawsers were part of the equipment stipulated for and this claim was abandoned by the petitioner at the hearing. The schooner Slaymaker was in the employ of the United States at Cross Ledge Light at the hire of $12 per day during the first five days of August, 1893. It is claimed by the petitioner that the schooner was

in such employ for the first six days in that month, but the evidence does not support this contention. The petitioner having received $60 for the hire of the schooner has been paid in full. The Taurus was in the employ of the United States at Cross Ledge Light at the hire of $40 per day during the first five days of August, 1893. The claim of the petitioner that the tug was in such employ for the first six days of that month is not sustained by the evidence, but the petitioner having received only $120 on account of hire during that period there is a balance due from the United States to it of $80. The Slaymaker and Taurus were discharged from the service of the United States August 5, at 2 o'clock in the afternoon, and with due diligence both vessels should have reached Wilmington before midnight of that day, and consequently the United States did not expressly or impliedly bind itself for their hire beyond that day. The Taurus on July 12, 1893, rendered certain services to the United States, as set forth in the petition, for which two charges aggregating $5 were made. These services were accepted by the United States, the amount charged was moderate, and no reason is perceived why the petitioner is not entitled to recover the amount so charged. It appears that a small boat, of the value of $10, by which Brandebury sent his order to the Taurus was through the negligence of the messenger permitted to drift against the wheel of the tug and that thereby it was destroyed. It was owned by the petitioner. It is admitted in the petition that the United States is entitled to a credit of $21 for sand returned by the latter to the former.

The conclusions of law reached by the court are as follows:

1. The petitioner in contracting with the United States for the chartering or hiring of the Saunterer to the latter undertook that she should be "in first-class condition, fully equipped, with all the necessary anchors, lines, chains, pumps, etc.," and that she should be "in charge of a competent man to be selected and paid" by the petitioner. The provision for an inspection of the vessel before it should enter the service of the United States was a stipulation on the part of the United States reserving to it the right to decline to permit the vessel to enter such service should the United States be dissatisfied with her condition, and was not intended nor did it directly or indirectly operate to relieve the petitioner of its obligation that the vessel should be in proper condition with sufficient equipment and in charge of a competent man. Much stress was laid in the argument for the petitioner on the proposition that the approval of the vessel and her equipment by the United States after inspection must be treated either as a conclusive admission by the United States that she was in proper condition and sufficiently equipped or as a waiver by the United States of any and all defects or insufficiencies in her condition and equipment. Some color is lent to this contention by the sentence in Brandebury's letter of July 1, 1893, as follows: "An inspection of the vessels will be made on or before July 8, and if found in proper condition the same will enter the service of the United States on July 12, 1893," etc. But taking the correspondence constituting the contract as a whole the contention thus made cannot be sustained. The petitioner in its letter of June 20, said: "We will charter you one of our small sand scows at ten

dollars per day; and the barge Saunterer at ten dollars per day, Sundays included, you to assume all risk of vessels." This proposition contemplated that without condition or qualification the Saunterer, if employed by the United States, should be at its risk, and it did not express any undertaking on the part of the petitioner that the Saunterer should be in proper condition and with sufficient equipment. This offer in the unqualified form in which it was made was not satisfactory to the United States; for Brandebury in his letter of July 1, says: "Your proposition of June 20, 1893, in relation to the hire of certain vessels, etc., is accepted under the following conditions: The barge 'Saunterer' and small scow will be chartered by this office on and after July 12, 1893, for the sum of ten (10) dollars per day each (Sundays included), it being understood that both vessels shall be in first-class condition, fully equipped, with all the necessary anchors, lines, chains, pumps, etc., and that each shall be in charge of a competent man to be selected and paid by you." To hold that the subsequent provision in the same letter for an inspection by the United States must be so construed as to emasculate and largely nullify the stipulation, pointedly insisted on by the United States, that the Saunterer should be in first-class condition and with sufficient equipment, would contravene the manifest intention of the parties. If it had been contemplated that an inspection by the United States should constitute the conclusive test of the condition and equipment of the vessel no reason is perceived why the provision for an inspection should not have stood alone, and the stipulation that the vessels should be in proper condition and with sufficient equipment been omitted. Contracts must receive such reasonable construction as will give, if possible, appropriate effect to their various provisions. There is no difficulty here in resorting to such construction. So construed, the contract, in this connection, is to the effect that the Saunterer when employed by the United States should be in first-class condition and properly equipped, and further that the United States should not be obliged to accept her for such employment without an opportunity of first inspecting her in order to judge whether she would prove suitable for the work for which she was to be employed. It is unreasonable to assume that such an inspection as was provided for was intended to be so minute and in such detail as to dispense with the usual liability of the vessel owner for unseaworthiness in particulars discoverable perchance only by close examination.

2. The United States in contracting with the petitioner for the chartering or hiring of the Saunterer and scow undertook to "be responsible for and assume all risks on account of loss or damage to the vessels by reason of storms, fire or accident while at Cross Ledge Light," but stipulated that it should not be responsible for nor pay any charges on account of any loss or damage to said vessels from any cause while en route to Cross Ledge Light or returning therefrom. Nor did the United States undertake to be responsible for any loss or damage to the Saunterer or her cargo resulting from unseaworthiness either in the condition or equipment of the vessel or in

the incompetence of the person placed in charge of her by the petitioner.

3. The petitioner in chartering or hiring the Taurus to the United States July 15, 1893, to attend the Saunterer and scow during the progress of the work at Cross Ledge Light impliedly contracted that the tug was properly equipped and that those in immediate charge of her movements had reasonably competent knowledge of the waters and channels of the bay in the vicinity of Cross Ledge Light including the course from that place to Maurice River. The omission to supply the Taurus with a chart and the want of familiarity of her master and pilot with those waters constituted a breach of such implied contract for the consequences of which the petitioner, and not the United States, is responsible.

4. The United States is entitled to the benefit by way of defense to this suit, so far as it is sought to recover the price of the 302 barrels of cement, of any claim it may have against the petitioner for the loss or destruction of that cement through breach of contract on the part of the petitioner. By virtue of sections 1 and 2 of the act of March 3, 1887 (24 Stat. 505), under which this petition was filed, this court has jurisdiction to hear and determine "all set-offs, counter-claims, claims for damages, whether liquidated or unliquidated, or other demands whatsoever on the part of the Government of the United States against any claimant against the Government." Section 6 of the act provides, among other things, that a copy of the petition shall be served on the district attorney and that "it shall be the duty of the district attorney upon whom service of petition is made as aforesaid to appear and defend the interests of the Government in the suit, and within sixty days after the service of petition upon him, unless the time should be extended by order of the court made in the case to file a plea, answer, or demurrer on the part of the Government, and to file a notice of any counter-claim, set-off, claim for damages, or other demand or defense whatsoever of the Government in the premises." It appears from the record that service of a copy of the petition on the district attorney was made May 10, 1894, and that the answer was filed July 16, 1894. It does not appear that any order was made extending the time for filing the answer nor that aside from the answer any notice of counter-claim, set-off, claim for damages or other demand or defense has been filed. The answer, however, among other things, in substance avers that the Saunterer was unseaworthy, that her master was incompetent, that the Taurus needlessly followed a dangerous course instead of proceeding with the Saunterer and scow to Maurice River, that thereby the cement was lost, and that the petitioner is not entitled to recover its price or value from the United States. These allegations, while not formally and technically setting forth the loss of the cement as constituting a counter-claim or claim for damages on the part of the United States, fully notified the petitioner that by reason of the fact that the United States was through breach of contract by the petitioner prevented from having the use and benefit of the cement, the United States thereby sustained damage and would resist the claim of the petitioner to be paid for the lost cement.

Though informal in this connection the answer contains a sufficient notice of counter-claim or claim for damage. When the answer was filed this notice was necessarily filed. That the notice was not contained in a paper separate from the answer involves at most a question of form and not of substance. The omission to file the answer and notice within the prescribed period was not a jurisdictional defect in the proceedings, but only an irregularity. After the filing of the answer and notice the parties without objection on the part of the petitioner adduced voluminous evidence in relation to the circumstances under which the cement was lost and no objection has at any time been made to the discussion or consideration of the question whether on the evidence so adduced the United States has a counter-claim or claim for damages by way of defense to the recovery by the petitioner of the price of the cement. In view of these facts the irregularity in the procedure must be held to have been waived.

It follows from the foregoing findings of fact and conclusions of law that the petitioner is entitled to recover, with interest, from the United States, subject to a deduction of $21 on account of sand returned to the petitioner, $80 for the hire of the Taurus in the early part of August, 1893, $10 for the destruction of the small boat July 15, 1893, $40 for the hire of the Saunterer from July 12 to 15, 1893, inclusive, and $5 for towage services rendered by the Taurus July 12, 1893, but nothing further. Judgment will accordingly be entered in favor of the petitioner for $114, with interest from September 1, 1893, but without costs.